#26921-LSW
**2014 S.D. 57**

IN THE SUPREME COURT
OF THE
STATE OF SOUTH DAKOTA

* * * *

In the Matter of the CERTIFICATION OF A QUESTION OF LAW FROM THE
UNITED STATES DISTRICT COURT, DISTRICT OF SOUTH DAKOTA,
SOUTHERN DIVISION, Pursuant to the Provisions of SDCL 15-24A-1, and
Concerning Federal Action Civ. 12-4061-KES, Titled as Follows:

* * * *

FIRST DAKOTA NATIONAL BANK,        Plaintiff,

    v.

BANCINSURE, INC.,        Defendant.

* * * *

ORIGINAL PROCEEDING

* * * *

SHEILA S. WOODWARD
STEVEN K. HUFF of
Johnson, Miner, Marlow,
  Woodward & Huff, Prof. LLC
Yankton, South Dakota        Attorneys for plaintiff.


WILLIAM P. FULLER of
Fuller & Williamson, LLP
Sioux Falls, South Dakota

    and

EMERIC J. DWYER
JOSEPH A.NILAN of
Gregerson, Rosow, Johnson & Nilan, LTD
Minneapolis, Minnesota        Attorneys for defendant.

* * * *

CONSIDERED ON BRIEFS
ON MAY 27, 2014
OPINION FILED **07/30/14**

#26921

WILBUR, Justice

[¶1.]     In answer to a certified question from the United States District Court

for the District of South Dakota, we conclude that the Financial Institution Bond in

this case is not a surety contract.

*Background*

[¶2.]     First Dakota National Bank purchased a Financial Institution Bond

from BancInsure, Inc. to provide coverage for liability issues that could arise in the

course of its operations.  The Bond provides in pertinent part:

> Legal proceedings for the recovery of any loss under this Bond
> shall not be brought prior to the expiration of sixty (60) days
> after the original proof of loss is filed with [BancInsure] or after
> the expiration of 24 months from the discovery of such loss,
> except that any action or proceeding to recover under this Bond
> on account of any judgment against [First Dakota] in any suit
> mentioned in General Agreement (F), or to recover attorneys'
> fees paid in any such suit, shall be brought within 24 months
> from the date upon which the judgment and such suit shall
> become final.

[¶3.]     In 2004, First Dakota loaned Terry Schulte $250,000.  Loan officer

Wayne Wassink was in charge of the Schulte loan.  Over the next five years, the

Schulte loan was reviewed annually and renewed, and the interest on the loan was

paid until the loan matured.  Wassink always transacted business concerning the

Schulte loan exclusively through Schulte's intermediary, Douglas Larsen.

[¶4.]     In October 2009, Wassink met with Schulte because the Schulte loan

was past due.  Schulte told Wassink he did not have a line of credit with First

Dakota and suggested that Larsen must have forged the note. After an

investigation, First Dakota believed certain documents used to renew the Schulte

loan had falsified signatures.[1] First Dakota notified BancInsure of the potential forgery on October 13, 2009.

[¶5.] In July 2011, First Dakota filed a proof of loss with BancInsure seeking coverage under the Bond for three loans, including the Schulte loan. In November 2011, BancInsure denied coverage on two of the three claims and stated that the information submitted regarding the Schulte Loan was insufficient to prove coverage under the Bond. In response, First Dakota agreed the other two loans were not covered, but maintained there was coverage for the Schulte loan under the Bond. In March 2012, BancInsure again denied coverage for the Schulte loan and informed First Dakota it had not brought suit within two years since the loss was discovered.

[¶6.] In April 2012, First Dakota sued BancInsure in federal court seeking coverage under the Bond and damages for bad-faith denial of the claim and vexatious refusal to pay the claim. BancInsure moved for summary judgment because the claim fell outside the two-year statute of limitations outlined in the Bond. The following question was then certified to this Court:

> SDCL 53-9-6 prohibits parties from contractually limiting the statute of limitations except in the case of a "surety contract." Is the Financial Institution Bond a "surety contract"?

---

1. Wassink and Larsen were indicted on federal charges of fraud and other related matters concerning the Schulte loan transaction. Larsen pleaded guilty to the charges. Wassink maintained his innocence, but he ultimately pleaded guilty to structuring and tax evasion on unrelated charges.

## Standard of Review

[¶7.] "Technically, this Court does not sit as an appellate court in this case as the matter came to us as a certified question from the United States District Court for the District of South Dakota. Nevertheless, we employ the same legal standards for this analysis that we use when reviewing appellate cases." *Unruh v. Davison Cnty.*, 2008 S.D. 9, ¶ 5, 744 N.W.2d 839, 841-42. We interpret contracts and statutes de novo. *In re Pooled Advocate Trust*, 2012 S.D. 24, ¶ 20, 813 N.W.2d 130, 138; *Lillibridge v. Meade Sch. Dist. No. 46-1*, 2008 S.D. 17, ¶ 9, 746 N.W.2d 428, 431.

## Decision

[¶8.] "In matters of statutory interpretation, this Court begins with the plain language and structure of the statute." *State ex rel. Dep't of Transp. v. Clark*, 2011 S.D. 20, ¶ 10, 798 N.W.2d 160, 164 (citations omitted). "Words and phrases in a statute must be given their plain meaning and effect." *Id.* ¶ 5, 798 N.W.2d at 162 (citation omitted). In addition, it is fundamental "that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme." *In re Expungement of Oliver*, 2012 S.D. 9, ¶ 9, 810 N.W. 2d 350, 352 (citations omitted). "[I]t is inappropriate to select one statute on a topic and disregard another statute which may modify or limit the effective scope of the former statute." *Id.* (citation omitted). Accordingly, we are not free to "enlarge the scope of [a] statute by an unwarranted interpretation of its language." *In re Adams*, 329 N.W.2d 882, 884 (S.D. 1983) (citation omitted).

[¶9.]      In relying on SDCL 56-2-1, First Dakota argues that the Bond is not a surety contract because BancInsure did not promise to perform any obligation of First Dakota, but rather agreed to indemnify First Dakota for covered losses, e.g., employee infidelity. In response, BancInsure argues that because the Bond is fidelity insurance, which is defined as surety insurance in SDCL 58-9-29, the Bond is a surety contract that satisfies the exception of SDCL 53-9-6. In making its arguments, BancInsure relies on the analysis in *Resolution Trust Corp. v. Hartford Accident & Indemnity Co.*, 25 F.3d 657 (8th Cir. 1994). In addition, BancInsure argues that the necessary element of a surety contract—the surety's responsibility to perform the defaulting principal's obligation to a third party—is BancInsure's promise to secure First Dakota from its employees' infidelity.

[¶10.]      SDCL 53-9-6 voids contract provisions, except those in surety contracts, that limit the statute of limitations.[2] But SDCL 53-9-6 fails to define a surety contract. Instead, we turn to SDCL 56-2-1:

> Suretyship is a contract by which one[, the surety,] who at the request of another[, the principal,] and for the purpose of securing to [the principal] a benefit becomes responsible for the performance by the [principal] of some act in favor of a third person . . . .

In interpreting SDCL 56-2-1, we stated:

---

2.    SDCL 53-9-6 reads in relevant part:

> Every provision in a contract restricting a party from enforcing his rights under it by usual legal proceedings in ordinary tribunals, or limiting his time to do so, is void. However, . . . any provision in a surety contract which limits the time for enforcement is valid and enforceable if the limitation of time is not less than two years after the cause of action has accrued.

> Suretyship is a contractual relationship, which results from two persons becoming obligated to the same creditor with one of them bearing the ultimate liability. In other words, if the debt is enforced against the surety, he then is entitled to be indemnified by the one who should have paid the debt before the surety was compelled to do so.

*State of Wis. Inv. Bd. v. Hurst*, 410 N.W.2d 560, 562-63 (S.D. 1987).[3] Because suretyship is defined in statute and interpreted in our case law as a contractual relationship, we conclude that suretyship is a surety contract as used in SDCL 53-9-6.

[¶11.] In applying the plain language of SDCL 56-2-1 to the Bond, we conclude that the Bond is not a surety contract. In order for the Bond to satisfy the definition of a surety contract, BancInsure must become responsible for First Dakota's performance "of some *act* in favor of a third person." SDCL 56-2-1 (emphasis added). The Bond does not identify "some act" that BancInsure is responsible to perform in case of First Dakota's default. Rather, the Bond provides that BancInsure, "in consideration of an agreed premium and subject to the . . . terms of this Bond, agrees to indemnify" First Dakota for, inter alia, "[l]oss resulting directly from dishonest or fraudulent acts committed by an Employee acting alone or in collusion with others" and "[l]oss resulting directly from . . .

---

3.     *See also* 1 Steven Plitt et al., *Couch on Insurance* § 1:14 (3d ed. 2014) ("Suretyship is a contractual relation resulting from an agreement whereby one person, the surety, engages to be answerable for the debt, default, or miscarriage of another, the principal."); 74 Am. Jur. 2d *Suretyship* § 1 (2014) ("A suretyship is a three-party relationship where the surety undertakes to perform to an obligee if the principal fails to do so. . . . In suretyship, the risk of loss remains with the principal while the surety merely lends its credit so as to guarantee payment or performance in the event that the principal defaults.").

delivering any funds" on the basis of forgery. Because the Bond is missing the language that satisfies the critical element of a surety contract—BancInsure becoming responsible for First Dakota's performance "of some act in favor of a third person"—it is not a surety contract. *See* SDCL 56-2-1.

[¶12.] BancInsure argues that the principal (the party that is primarily obligated to perform some act) is not First Dakota, but rather First Dakota's employees. In doing so, it states "the Bond obligates BancInsure to pay [First Dakota] in certain enumerated circumstances where [First Dakota's] employees or certain other third-parties do not carry out their obligations to [First Dakota]." As a result, "BancInsure guarantees to [First Dakota] the fidelity of the actions of [First Dakota] employees and other third parties." We disagree. First, in order to have a surety contract under SDCL 56-2-1, the principal must *request* surety protection. No evidence exists showing First Dakota's employees have made such a request. Indeed, the Bond is a contract between First Dakota and BancInsure. Second, the Bond does not articulate a guarantee that First Dakota's employees will act honestly, but rather protects First Dakota by indemnifying it from employee dishonesty.[4]

---

4. *Compare* SDCL 58-1-2(8) (providing that insurance is "a contract whereby one undertakes to indemnify another or to pay or provide a specified or determinable amount or benefit upon determinable contingencies"), *and* SDCL 56-3-1 ("Indemnity is a contract by which one engages to save another from a legal consequence of the conduct of one of the parties, or of some other person."), *and* Bryan A. Garner, *Garner's Dictionary of Legal Usage*, 445 (3d ed. 2011) ("To indemnify may mean either (1) to secure against future losses; or (2) to pay for losses already sustained."), *with* SDCL 56-2-1 ("Suretyship is a contract by which one who at the request of another and for the purpose of securing to him a benefit becomes responsible for the performance by the

(continued . . .)

[¶13.]	BancInsure also urges this Court to conclude the Bond is a surety contract on the basis of SDCL 58-9-29 and the analysis of *Resolution Trust*. SDCL 58-9-29 states: "'Surety insurance' includes fidelity insurance, insurance to guarantee the fidelity of persons holding positions of public or private trust." BancInsure argues a four-step analysis: First, the Bond is fidelity insurance because it protects First Dakota from employee dishonesty; second, SDCL 58-9-29 plainly states that fidelity insurance is surety insurance; third, the Bond is a contract; and fourth, as a result, the Bond is a surety insurance contract, the equivalent of a surety contract as stated in SDCL 53-9-6. BancInsure relies on *Resolution Trust*, an eighth circuit case holding that fidelity insurance is a surety contract.[5] We decline to adopt *Resolution Trust's* analysis. *See Fraternal Order of Eagles No. 2421 of Vermillion v. Hasse*, 2000 S.D. 139, ¶ 11, 618 N.W.2d 735, 738 (citing S.D. Const. art. V, § 2) (additional citations omitted) (providing that the United States Eighth Circuit Court of Appeals "is not binding on issues of South Dakota state law").

---

(. . . continued)

>	latter of some act in favor of a third person . . . ."), *and* Garner, *supra* at 870 (providing that a surety, in law, is "one who undertakes some specific responsibility on behalf of another").

5.	*Resolution Trust* reversed the ruling of the United States District Court for the District of South Dakota, which held the fidelity insurance at issue in *Resolution Trust* was not a surety contract under SDCL 53-9-6. 25 F.3d at 659; *see also First Fed. Bank, F.S.B. v. Hartford Accident & Indem. Co.*, 762 F. Supp. 1352, 1354 (D.S.D. 1991) (holding that a fidelity bond was not a surety contract). After *Resolution Trust*, South Dakota's district court tolled the contractual two-year statute of limitations. *F.D.I.C. v. Hartford Accident & Indem. Co.*, 97 F.3d 1148, 1149 (8th Cir. 1996). The eighth circuit again reversed and remanded. *Id.* at 1152.

[¶14.]     We conclude the kinds of insurance included in surety insurance, as outlined in SDCL 58-9-29 through SDCL 58-9-32, are not equivalent to surety contracts as stated in SDCL 53-9-6 and defined in SDCL 56-2-1.  SDCL 58-9-29 through SDCL 58-9-32 neither contain nor define the words surety contract, but rather outline what kinds of insurance are included in surety insurance.  SDCL 56-2-1 (defining suretyship) became law in 1939; SDCL 58-9-29 through SDCL 58-9-32 became law in 1966 (outlining kinds of surety insurance); and SDCL 53-9-6's exception for surety contracts became law in 1988.  This timeframe demonstrates the Legislature knew, when writing what kinds of insurance were included in surety insurance, the definition of a suretyship, but declined to use that language. It further demonstrates that when the Legislature was making the exception to SDCL 53-9-6, it operated under the knowledge of both surety insurance in SDCL 58-9-29 through SDCL 58-9-32 and suretyship in SDCL 56-2-1, but included only the words surety contract in making the exception.

[¶15.]     In addition, when outlining what kinds of insurance are included in surety insurance, the Legislature made a clear distinction between surety insurance and contracts of suretyship.  SDCL 58-9-31 reads:

> "Surety insurance" includes insurance guaranteeing the performance of contracts, other than insurance policies, and guaranteeing and executing bonds, undertakings, and contracts of suretyship.

SDCL 58-9-31 plainly states that surety insurance includes "insurance . . . guaranteeing and executing . . . contracts of suretyship."  SDCL 58-9-31 does not say that surety insurance *is* a contract of suretyship, but rather *insurance* on a contract of suretyship.  Therefore, we conclude that SDCL 58-9-29 through SDCL

58-9-32 were "intended to provide a general definition of surety insurance for purposes of the insurance code of South Dakota" and were not intended to define a surety contract. *See Resolution Trust*, 25 F.3d at 660 (Arnold, J., concurring in result). Indeed, *Resolution Trust* did not address SDCL 56-2-1, South Dakota's definition of suretyship.

[¶16.] Furthermore, the surety contract exception found in SDCL 53-9-6 was passed in the legislative session immediately following *Sheehan v. Morris Irrigation*, 410 N.W.2d 569 (S.D. 1987). The relationship present in *Sheehan* explains what type of relationship constitutes a surety contract. In *Sheehan*, the landowner (Sheehan) contracted with Morris Irrigation to build a massive irrigation system. *Id.* at 570. "To assure completion of the project," Morris Irrigation secured a performance bond from United Pacific, the surety on the bond. *Id.* The performance bond contractually limited the statute of limitations to two years. *Id.* Sheehan filed suit against Morris Irrigation and United Pacific because the irrigation system did not operate properly, but did so five years after Sheehan's cause of action accrued. *Id.* At the time of *Sheehan*, no exception for surety contracts existed in SDCL 53-9-6. As a result, this Court held the bond's two-year contractual limit of the statute of limitations was void, allowing suit against the surety. *Id.* at 571. Justice Sabers dissented urging the Legislature to create an exception for construction bonds. *Id.* (Sabers, J., dissenting).[6] Moreover, on the

---

6.     The dissent argued:

> If the majority opinion is sustained, and not altered by the [L]egislature, it will not only heap havoc upon the construction

(continued . . .)

same day that *Sheehan* was published, *Hurst* was also published, which interpreted suretyship as defined in SDCL 56-2-1. 410 N.W.2d at 562-63 ("Suretyship is a contractual relationship, which results from two persons becoming obligated to the same creditor with one of them bearing the ultimate liability.").

[¶17.] In 1988, in the first legislative session after *Sheehan* and *Hurst* were decided, the Legislature created the exception in SDCL 53-9-6 that allowed surety contracts to contractually limit the statute of limitations to two years. This immediate action exhibits the Legislature's intent to allow parties to contractually limit the statute of limitations in surety situations similar to the relationship found in *Sheehan*. *See AEG Processing Ctr. No. 58, Inc. v. S.D. Dep't of Revenue & Regulation*, 2013 S.D. 75, ¶ 12, 838 N.W.2d 843, 848 (citation omitted) ("We presume the Legislature acts with knowledge of our judicial decisions."). Therefore, we conclude that a surety contract as stated in SDCL 53-9-6 does not equate to all kinds of surety insurance as outlined in SDCL 58-9-29 through SDCL 58-9-32, but rather equates to the type of relationship presented in *Sheehan* and defined in SDCL 56-2-1.

[¶18.] We conclude that the Bond in this case is not a surety contract.

[¶19.] GILBERTSON, Chief Justice, and KONENKAMP, ZINTER and SEVERSON, Justices, concur.

---

(. . . continued)

> bonding industry but make the cost of construction (payment and performance) bonds in South Dakota prohibitive to customers, farmers, businessmen, and other owners.

*Id.* (Sabers, J., dissenting).